*E-Filed: August 5, 2015*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA FOR THE USE OF SAN BENITO SUPPLY, | Case No. 13-cv-00469-HRL |
| Plaintiff, | **ORDER:** |
| v. | **(1) ON PLAINTIFF'S MOTION TO AMEND FINDINGS, MAKE ADDITIONAL FINDINGS, AMEND CONCLUSIONS OF LAW, AND AMEND THE JUDGMENT, AND** |
| KISAQ-RQ 8A 2 JV, et al., | |
| Defendants. | **(2) ADDITIONAL FINDINGS OF FACT** |
| | Re: Dkt. No. 140 |

### INTRODUCTION

Arguing that portions of the  Findings of Fact and Conclusions of Law are "clearly erroneous and constitute a manifest error," San Benito Supply ("SBS") moves the court to amend them, make new ones, and then change the judgment so it comes out in SBS's favor.

First, SBS says the court failed to take into account a document—the Credit Application—which was part of the totality of documents and other things that together constituted the "contract" between SBS and Frazier.  If it had properly taken the Credit Application into consideration, so the argument goes, the outcome in the case would have been different.

Second, SBS asserts for the first time that two categories of damages that the court awarded to Frazier were not supported by the law and should be deducted from the total.

The court will address each in turn.

**DISCUSSION**

## I.      THE CREDIT APPLICATION

The Army Corps of Engineers ("ACOE") contracted with KISAQ-RQ ("KISAQ") to design and build a vehicle maintenance and repair facility at Fort Hunter Liggett.  KISAQ contracted with a structural engineer ("SMR"), with a testing and inspection company ("CTE"), and with Frazier.  Frazier's job was to construct the tilt- up concrete walls and the special concrete slab floor.  The obligations of each were spelled out in typical, fully integrated written contracts. Frazier ultimately chose SBS to supply the ready-mix concrete for the job, but their relationship was not formalized in the typical form contract.  Instead, SBS submitted a pricing Proposal in February 2012; in March, SBS and Frazier met to negotiate over pricing and signed a work sheet; in April, Frazier's Controller filled out a credit application; and in July, Frazier issued a Purchase Order.  Then, to figure out just what was the "contract" between SBS and Frazier, the court also looked at the statements and actions between SBS and Frazier both during the performance stages of the project as well as, after placement and finishing, when the 6000 psi concrete was not curing to the required compressive strength.

SBS had proposed to supply 6000 psi concrete, and that is what Frazier bought in its purchase order. No one disputed that the 6000 psi concrete supplied by SBS did not cure to 6000 psi.  It had to be torn up and replaced.  How was SBS to avoid responsibility for the nonconforming concrete?  The cornerstone of its defense was its pricing Proposal, which included the language:  "Quality Assurance program by others."  A mountain of evidence showed that SBS designed the 6000 psi recipe, endorsed it (Teddy Schipper said he overdesigned that mix, so it was stronger than it needed to be), touted its use on an earlier project (which was untrue), defended it when early test results indicated low compressive strength, and never said otherwise until it finally became apparent that SBS was going to be expected to pay for its replacement.  At trial, SBS tried to establish that its obligation was not to mix 6000 psi concrete, but to mix concrete from a recipe that someone else had created and tested to assure it would cure to 6000 psi.  The court found that SBS committed to supply 6000 psi concrete based on a mix recipe that it developed and endorsed, and that the language relied on by SBS about "Quality Assurance program" had nothing to do with

mix design, but something else entirely.  (Finding #12)

The Credit Application that SBS now argues has not been given proper consideration by this court had always been "in" the case, because the first page has an attorney's fees clause:  "I agree to pay attorney's fees and costs that are incurred corresponding to collection of this account whether or not suit is instituted."  However, in the motion now before the court, SBS focuses on the third page of the document, "General Terms and Conditions of Sale," paragraph 4:

> SBS shall not be responsible for the slump, strength or quality of any concrete to which water or any other material is added by the BUYER, or at buyers [sic] request, nor for materials for which no Mix Design has been approved.  SBS has no control over the use, placing or handling of material after unloading and is, therefore, not responsible for the finished work in which it is used.  SBS HEREBY EXCLUDES ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PURPOSE, EXPRESS OR IMPLIED ON THE MATERIAL SOLD HEREUNDER . . . .

This exculpatory language of paragraph 4 never figured prominently in the case.   At trial, Frazier's counsel asked Ann Hillyard, SBS's bookkeeper, a few perfunctory questions about the Credit Application.  SBS's counsel asked Ted Schipper a couple of questions about the "approval" language, and Ted replied (as the court recalls) that he thought an engineer should have designed the mix. That was about it.

When, during closing argument, the court asked SBS's counsel what document or other things taken together constituted the "contract" between SBS and Frazier, counsel said it was primarily the Proposal, maybe the Purchase Order as well. He did not cite the Credit Application. So, the court asked him about it.  He replied that the Credit Application was a "separate contract." As for the exculpatory language in paragraph 4 on page 3, he argued that water was added by Frazier at the job site during the pour, and that excused SBS under the clause:  "SBS shall not be responsible for the slump, strength or quality of any concrete to which water or any other material is added by the BUYER or at buyers [sic] request . . . ."  In fact, however, the credible evidence was that Frazier asked SBS drivers to increase the slump of the concrete to meet specs, and to achieve that, the drivers added water.  Also, batch tickets showed that SBS trucks were dispatched from its batch plant with much less water than called for in the mix design, so there was no

1    problem with adding water at the pour site.  The court already found and concluded that Frazier's

2    placing and finishing of the concrete did not contribute to low compressive strength, and the proof

3    positive of that shows in the test results from the SBS companion cylinders, samples of the

4    concrete mix taken from trucks at the job site before Frazier did placing and finishing.  SBS's own

5    compression testing of the companion cylinders revealed a strength well below 6000 psi.

6    Finally, SBS's counsel during closing argument did allude to the "approval" language in

7    paragraph 4, but it seemed to be the same argument he had been advancing for "Quality Assurance

8    program by others."  The court found that lack of approval, if any, did not proximately cause the

9    failure of the 6000 psi concrete.  SBS caused it.  SBS did not escape liability for its blunders

10   because someone else did not catch them and fix them.

11   There was no mention of the Credit Application in SBS's Proposed Findings of Fact and

12   Conclusions of Law submitted prior to trial (Dkt. No. 143-1).  The court did not think anything

13   specific needed to be said about the language of paragraph 4 on page 3 of the Credit Application.

14   However, in view of SBS's current motion, it will now do so.

15   Frazier urges the court to simply disregard paragraph 4 on page three of the Credit

16   Application, and Frazier does have a point. The copy of the Credit Application attached to the

17   Complaint was unreadable.  The copy introduced into evidence was barely readable.  *See* Exh.

18   589.  The court asked SBS to produce the signed original, but it never did.  So, the court

19   demanded that SBS produce a readable blank copy of the Credit Application as it existed in April

20   2012.  SBS purported to comply by offering up what became Exhibit 151, but Exhibit 151 had a

21   signature and date line on page 3 for the applicant to signify "Agree to terms."  The actual Credit

22   Application submitted to Frazier had no such thing on page 3.

23   There are other problems with the Credit Application.  The third page is not identified as

24   page 3 of the Credit Application, and neither page 1 or 2  refers to or incorporates page 3.  Page 1

25   has Debbie Wall's signature under a section agreeing to a Personal Guarantee, although the

26   Guarantee language is entirely lined out.  She also signed another Personal Guarantee at the top of

27   page 2, although the text of that Guarantee is likewise lined out.  Then, the next two sections,

28   Credit References and Bank Information, are answered by "See Attached".  But, nothing is

United States District Court
Northern District of California

4

attached.  Ms. Wall's signature at the bottom of page 2 can be construed as her authorizing release of Frazier's credit history and banking information, although she already agreed to provide credit history when she signed the bottom of page 1.

Furthermore, who expects that by signing a document entitled "Credit Application" one would be bound—by tiny, smudgy print on a page that did not have a signature line—to language that might exculpate SBS from just about any responsibility for delivering nonconforming goods when a contract for sale of goods is subsequently entered?  Excuse it from obligations it specifically accepts in a contract of sale?  Indeed, is it likely any operating officer of Frazier would even see a credit application?  While sympathetic to Frazier's argument to ignore the Credit Application, the court does not have to go that far.

The exculpatory language in paragraph 4 that SBS relies upon is ambiguous and uncertain, and ambiguities and uncertainties must be construed against the drafter.  SBS claims to absolve itself from responsibility if the mix design was not "approved."  Approved by whom?  The language of the paragraph does not say.  The mix was approved specifically by Frazier, by KISAQ, and by the structural engineer.  Even though the "final, final" design did not make it to the ACOE, the ACOE had impliedly approved it because that design cured the single deficiency identified by the ACOE in the most recent prior submission. In any event, the court interprets the approval language to call for SBS's approval. It would make sense that SBS would not wish to take responsibility for a mix design that someone else had created. Here, SBS not only approved the mix design; it did the design.  It supported the design with ostensibly legitimate historical data of its prior use and success. When compression testing revealed that the 6000 psi slab was not curing up to the required strength, SBS defended its mix:  ". . . we [SBS] provided material in accord with the Spec." (Exh. 69), ". . . we stand behind our product . . ." (Exh. 540.1).  Not once, during the months between when low compression was first indicated and up until the decision was made to remove and replace the 6000 psi slab, did SBS contend the mix design was not approved.

The second argument SBS makes focuses on the language in paragraph 4 about it not being responsible for the "finished work" because it had no control over the concrete once it was

delivered to the job site.  This is an argument SBS made at trial, although until now that argument had not been tethered to the language in the Credit Application.  At trial, SBS witnesses cataloged a long list of alleged mistakes made by Frazier in placing and finishing the concrete.  However, there was much more compelling evidence that Frazier's missteps, even if any occurred, did not affect the compressive strength of the slab.  That is, SBS was not held responsible for any errors in placement and finishing.  It was held responsible for its faulty mix design, which resulted in a failure that had nothing to do with placement and finishing.

Finally, SBS points to the language excluding any express or implied warranties of merchantability or fitness for purpose and argues that it should be home free from liability.  If SBS thought this was a winning argument, it is curious it did not make it before trial, during trial, or in closing argument.  True, Frazier's Counterclaim included a cause of action for breach of implied warranties.  In its Answer, SBS generally denied the warranty allegations, but said nothing about any exculpatory language in the Credit Application.  More importantly, the Counterclaim also had a claim for breach of contract.  Frazier contacted with SBS for 6000 psi concrete.  SBS in its answer to the breach of contract claim admitted that it entered into a contract with Frazier ". . . under which San Benito agreed to supply various types and strengths of ready mixed concrete . . . ."  The court found that SBS did not supply what it contracted to supply: actual 6000 psi concrete.  The exclusion of warranties language in the Credit Application is irrelevant to the court's analysis.

## II.   ADDITIONAL FINDINGS OF FACT

27a.  With respect to the exculpatory language in paragraph 4 on page 3 of the Credit Application:

1.      The compressive failure of the 6000 psi concrete did not occur because of any water added to the batch mixes at the pour site.

2.      Frazier did not add water or ask that water be added to the batches at the pour site. Frazier did ask that the poured concrete's "slump" be increased to the level called for in the specs,

and the SBS drivers added water to accomplish that.

3.      SBS trucks left the batch plant with much less water than called for in its mix design, so no detriment of any kind resulted when some water was added at the pour site.

4.      The final mix design had been "approved" by SBS, and was either expressly or implicitly approved by all others who were supposed to do so.

5.      Any purported exclusion of express or implied warranties does not excuse SBS's failure to deliver conforming 6000 psi concrete.

### III.    TWO ITEMS OF FRAZIER'S DAMAGES

SBS argues that the court erroneously awarded Frazier as items of damages:  (1) the fees it paid two consulting experts (Messrs. Rothstein and Klorman) and (2) Frazier's 15% markup on backcharges it had to pay to the general contractor, KISAQ.  The experts were hired by Frazier to assess and analyze the nonconforming concrete during the months when all concerned were trying to try to find a solution to the problem of low compressive strength.  The markup was added to the charges imposed on Frazier by KISAQ for extra costs KISAQ incurred because of the removal and replacement of the 6000 psi pad.

At trial, SBS did not challenge any of the categories in Frazier's damage claim, and the court made a specific Finding of Fact to that effect:  "SBS did not challenge any item on Frazier's itemized list of costs for this work . . . ." (Finding #29.)

Basically, SBS is now saying that neither consulting experts' fees nor a markup on KISAQ backcharges are legitimate "damages" in a breach of contract case.  The problem with raising this argument now is that it did not pursue it before now.  Frazier's claimed damages were disclosed in discovery.  They are spelled out plainly on an itemized list in Exhibit 780, which was in SBS's hands weeks before the pretrial conference and months before the trial.  If SBS wished, it could have challenged them early on in a motion for partial summary judgment.  Or, it could have made

United States District Court
Northern District of California

a motion in limine.  It could have moved to strike or exclude these two categories of damages from Exhibit 780.  It should have raised the issue during closing argument, coupled with a request to submit briefing to support it.  Alternatively, it could have asked leave to brief it during the two months between submission of the case and the issuance of the court's decision.

SBS took none of the steps just suggested, and it is too late to challenge the items now.  In its opposition to the present motion, Frazier has made very credible arguments supporting its recovery of the expert fees and backcharges, but the court does not rely on them.  Instead, it denies this portion of SBS's motion as unforgivably untimely.

## CONCLUSION

In summary, the court has made additional Findings to clarify its interpretation of the Credit Application, but does not agree with any of SBS's proposed amended and/or additional Findings or Conclusions or its proposed Amended Judgment.  The motion is denied.

**IT IS SO ORDERED.**

Dated: August 5, 2015

_____
HOWARD R. LLOYD
United States Magistrate Judge